# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN D. CRAWFORD,** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | **CIVIL ACTION NO. 1:CV-03-693** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, COUNTY OF** | : | |
| **DAUPHIN, CITY OF HARRISBURG,** | : | |
| **JANICE ROADCAP,** | : | |
| **JOHN C. BALSHY, and WALTON** | : | |
| **DEWEY SIMPSON, JR.,** | : | |
| **ADMINISTRATOR OF THE ESTATE** | : | |
| **OF WALTON D. SIMPSON,** | : | |
| **Defendants** | : | |

## MEMORANDUM

This case involves the criminal prosecution and 28 year incarceration of Plaintiff Steven Crawford for the murder of John Eddie Mitchell in 1970, for which Plaintiff has always maintained his innocence. Upon discovery of certain evidence that called the Commonwealth's case against him into question, Plaintiff was released from prison on nominal bail on June 24, 2002. Thereafter, the District Attorney of Dauphin County, Pennsylvania, nol prossed all charges against Plaintiff. Plaintiff brings this action for damages for violation of his civil rights under color of law along with state law and tort claims. The case is now before the Court on motions for summary judgment filed by all Defendants. The motions have been fully briefed and are ripe for disposition. For the reasons discussed below, the

motions of Dauphin County and the individual defendants will be denied and the City of Harrisburg's motion will be granted.

## I.   **BACKGROUND**

In September 1970, Plaintiff was a fourteen year child.  On September 12, 1970, Plaintiff's friend, thirteen year old John Eddie Mitchell was bludgeoned to death and his body left in a garage owned by Plaintiff's father, William Banks.   Police discovered the body when they searched the garages on Atlas Street after a sledgehammer containing blood and hair was found nearby.  It appeared that Mitchell was murdered for approximately $30.00 in paper route money he had collected that morning.  Although not noted in any police reports,[1] two of the victim's sisters, Kathy Mitchell and Vanessa Mitchell, testified at trial that Steven Crawford came to the Mitchell residence twice during the morning of September 12, 1970, and the second time left with John Mitchell, the last time he was seen alive.  (Doc. No. 115, Defendants' Joint Appendix of Exhibits in Support of Defendants' motions for Summary Judgment,[2] Ex. 3, N.T. at 401-02; 433-34.)  Crawford disputed this, and provided evidence at his trials that he was working on a go-cart with his neighbor, Roy Lewis, all day, leaving only for 5-10 minute periods to get gas.

Other circumstantial evidence loosely connected Crawford to the crime, such as testimony that a sledgehammer that looked like the murder weapon was previously seen under the porch at the

---

[1]     Officer Samuel Kohr testified that he went to the Mitchell home the Monday evening after the murder and took "supplemental" statements from the girls.  (J.A., Ex. 3, N.T. at 455.)  He stated that he prepared a report, but that he did not have the girls sign the report and that he could not find the supplemental report.  (Id. at 460-65.)

[2]     The Joint Appendix will hereinafter be cited as J.A.

2

Crawford/Banks residence, and that Crawford said to police investigators that they did not need to search his garage because there were just old cars in there.[3]  Park Bollinger  testified that he saw Crawford and another boy about the same size as Crawford (whom he could not identify as the victim)[4] while he was painting the adjoining garage (belonging to him, which he rented to LeRoy Brown) at around the time of the murder. (J.A., Ex. 3, N.T. at 480; 496.)  An autopsy report revealed that Mitchell was killed by the delivery of three blows to the back of the head with a blunt instrument, shattering his skull and leading to brain bruising and laceration.  The injury was consistent with a blow by the sledge-hammer recovered.  (Id. at 345-53.)  Mitchell also suffered non-fatal wounds to his chest inflicted by a crow bar or other sharp object.  (Id. at 349-51.)  After discovering the body and removing one of the cars from the garage, police dusted the cars for prints.  Eighteen prints were recovered from the two cars, eight of which were deemed capable of identification, and five of which were ultimately identified.

In September of 1972, Detective Walton Simpson identified one of the partial palm prints lifted from the two cars as belonging to Plaintiff.[5]  Simpson went to the office of Corporal John Balshy of the Pennsylvania State Police, who confirmed the identification.  Because Crawford had access to the car where the print was recovered, it was important for the police to date the print for it to have any

---

[3]        At least one person testified at the third trial that Crawford stated that there was no need to search the garage because it had already been searched.

[4]        At the time of the murder, Plaintiff was fourteen years old, a head shorter and at least 25 pounds lighter than Mitchell.

[5]         Simpson later was able to match two additional palmprints to Crawford and two others to Officer Eldon Beachley, the officer who discovered the body and admittedly touched the vehicles as he maneuvered through the dark garage.

significance to the case.  To this end, Simpson and Balshy traveled to Washington, D.C. to the Bureau

of Alcohol, Tobacco and Firearms ("ATF") in order to learn whether they could analyze the print to

determine whether the print was left at or near the time of the murder.  (J.A., Ex. 3, N.T., at 606-08.)

 ATF was not able to assist them, explaining that there was no way to date the prints.  See

Commonwealth v. Crawford, 364 A.2d 660, 663 (Pa. 1976) (granting a new trial because Simpson

testified at the first trial beyond his expertise that the prints were placed on the car at the time of the

killing, despite what he was told by ATF).  It was at this time, when he viewed the print under a

powerful microscope at ATF, that Simpson first observed brownish-red particles on the print.  (Id.)

Simpson and Balshy then took the print to Janice Roadcap, a chemist for the Pennsylvania State Police,

who reported that small particles of blood may be present on the ridges of at least one of the prints.

Simpson, Roadcap, and Balshy were present for the initial testing of the microscopic red-brown

particles on November 29, 1972.  (J.A., Ex.1, N.T. at 419; Ex. 3, N.T. at 663 & 666.)  Roadcap

tested the particles from three small strips of the palmprint using the reagent Benzidine to screen for the

presence of blood.  In her lab notes, she noted a positive reaction from the reagent and fingerprint

powder.  The original note stated at paragraph seven that the reaction "was greater along the ridges of

the fingerprint, however, numerous particles in the valleys also gave [positive] reactions."  (Ex. 5, at 1.)

In the remarks section of this lab note, Roadcap wrote, "A positive reaction was obtained with

Benzidine reagent.  This indicated the presence of blood ~~in the fingerprint impression.~~ deposited by the

donor of the fingerprint impression."  (Id.) (stricken out in original).  This lab note was not utilized in the

criminal prosecution of Crawford; rather, a lab report produced by Roadcap based on an altered lab

note formed the basis of the expert opinion testimony offered at trial.  (J.A., Ex. 7.)  The lab note was

4

altered at paragraph seven, quoted above, to read:  "This reaction was only along the ridges of the ~~finger~~print pattern."  (J.A., Ex. 6) (stricken out in original).  The word "greater" had been blacked out with an opaque marker with "only" written above the mark, and the words "however numerous particles in the valleys also gave [positive] reactions" were likewise obliterated.  (Id.)  These lab notes were not provided to defense counsel during Plaintiff's criminal proceedings, and the prosecuting attorneys had not seen the original note.[6]

Plaintiff was arrested for the crime in February of 1974.  On September 6, 1974, shortly before the trial and nearly two years after the initial testing of the print, Simpson – accompanied by James Morgan, the Assistant District Attorney prosecuting the case – had Roadcap perform additional analysis of the palmprint, this time without placing any limitations on preserving the print.[7]  (J.A., Ex. 3, N.T. at 610.)  Prior to this, in March of 1973, Simpson and Balshy visited Beverly Frison of the Royal Canadian Mounted Police and provided the print for her to do additional testing.  Frison did a

---

[6]     Former Deputy District Attorney Peter Anderson testified at his deposition that he had seen the altered lab note and discussed the note extensively with Roadcap prior to the second trial because he thought she would be "crossed pretty hard about it."  (J.A., Ex. 30, Anderson Dep. at 8, 24.)  He also represented that he would have made this available to William Costopolous, Plaintiff's criminal defense counsel, and that he was surprised that Costopolous had not cross-examined Roadcap on the fact that it had clearly been altered, as indicated by the black markings. (Id. at 13-16, 24-25. Cf. J.A., Ex. 26, Costopolous Dep. at 27; Aff. at ¶ 1; Ex. 33, Roadcap Dep. at 53.)  While Defendants make much of this fact, it has not been claimed that anyone other than perhaps the individual Defendants in this case had access to the original, un-altered, lab note.  (See, e.g., J.A., Ex. 34 at 48 (recounting surprised expression of Assistant District Attorney upon seeing the lab notes for the first time).)  Furthermore, whether any prosecution or defense lawyers had the lab note is an issue of fact that must be resolved in favor of Plaintiff at this time.  Fed. R. Civ. P. 56.

[7]     Simpson and Morgan gave Roadcap permission to destroy the print, if necessary. However, they did not photograph the print microscopically to show the location of the brownish-red particles, and the individuals concede that following the further testing, the particles were essentially expended.  (J.A., Ex. 3, N.T. at 689; 676-78.)

haemochromagen test on some particles that she removed from the print and found blood.  (J.A., Ex. 1, N.T. at 288-91.)  She was unable to determine that it was human blood, and she received a negative test result for blood on two of the prints.  (J.A., Ex. 1, N.T. at 290-92, 428.)  Roadcap, however, testified that she was able to confirm that the particles were in fact blood of human origin by performing the Takayama test and the human anti-serum test on the remaining particles.  (J.A., Ex. 1, N.T. at 423-24.)  After using the Takayama reagent on the particles and waiting for several hours, she observed pink-colored crystals, which she claimed indicated a positive reaction for hemoglobin.  (Id. at 423; Ex. 3 at 672-73.)[8]

A jury found Plaintiff guilty of first-degree murder on September 18, 1974.  On appeal, the Pennsylvania Supreme Court reversed the conviction, finding that Simpson testified beyond his expertise when he opined that the palmprint was left at the scene of the crime at the time of the murder.  Commonwealth v. Crawford, 364 A.2d 660, 664 (Pa. 1976).  A second jury found Plaintiff guilty of first-degree murder in February of 1977.  Following the verdict, Judge Dowling granted Crawford's motion for a new trial because the Commonwealth failed to disclose potentially exculpatory evidence; namely, a confession by Richard Lee Zieders which was known by the District Attorney's Office as

---

[8]    The Commonwealth's outside expert at the third trial, Herbert MacDonnell, testified that crystallization should occur within a half an hour and if it did not occur fairly rapidly, that would indicate the test was negative for hemoglobin.  (J.A., Ex. 3, N.T. at 779-80.)  Crawford's expert explained that using the Takayama test, which he stated had been shown to have an error ratio of up to forty percent, a reaction should occur within five to twenty minutes and if it took over an hour, a scientist should conclude that the test was negative, since glucose crystals from the reagent itself could form and give a false positive.  (Id. at 855-58, 866.)

early as 1975 but not investigated.  (J.A., Ex. 17 at 4-6.)[9]   Before the third trial in February of 1978,

prosecutors offered Plaintiff a plea bargain for third-degree murder, which he declined against his

attorney's advice.  (J.A., Ex. 26, Costopolous Dep. at 14, 38.)[10]  Judge Dowling presided over a third

trial of Plaintiff, who was again convicted of first degree murder and sentenced to life imprisonment.

Plaintiff's direct appeals were denied, as were his post-conviction relief petitions.  After

exhausting all of his state court remedies with respect to his 1978 conviction, in 2000, Plaintiff filed a

petition for writ of habeas corpus in the Middle District of Pennsylvania (Civil Action No. 3:00-CV-

1739, Kosik, J.), challenging his conviction on twenty-six grounds.  The habeas court appointed

counsel, who petitioned the court for permission to inspect and perform DNA testing on the physical

evidence recovered from the crime scene, including three "Caucasian hairs" taken from the victim's

right hand.[11]

---

[9]      At Plaintiff's third criminal trial, Zieders testified that he did tell his girlfriend on five to
six occasions that he had killed Mitchell, that he had made racist remarks about the black children in the
neighborhood, and that he came home drunk the afternoon of the murder and had an argument with
Roy Lewis, the Bible teacher and neighbor who provided an alibi for Crawford, about the children's
bicycles and go-cart in his usual parking space on the street.  (J.A., Ex. 3 N.T. at 918-33.)  There was
further evidence that Zieders had a drinking problem, was known to be violent when drunk, and that his
alcohol problem intensified after 1970, according to his girlfriend because of the remorse he felt for
killing John Mitchell.  (Id.)

[10]     Plaintiff has maintained that if he had taken the agreement, he would have been
sentenced to time served; however, his defense attorney testified that the agreement was for 10 to 20
years, the guideline range for third-degree murder at that time.  (Costopolous Dep. at 14; 21-23; 38.)
The implication by counsel for Dauphin County that Plaintiff did not take this plea bargain because if he
had made an admission of guilt, "he would have been precluded from bringing this lawsuit" finds no
support and adds little to the legal analysis of Plaintiff's claims.  (Doc. No. 143, at 6.)

[11]     The hairs were discovered by Plaintiff's post-conviction counsel in 1995 when he
inspected the PSP crime lab repository and found a vial labeled "Caucasian hair."  The Pennsylvania
State Police Crime Lab Report dated December 28, 1970, attached to a pleading in Plaintiff's habeas

Sometime in 2001, a copy of Roadcap's original lab notes were found among other case documents in a discarded briefcase belonging to the late Walton Simpson.  The Dauphin County District Attorney's Office came into possession of the contents of the briefcase on May 20, 2001.  (J.A., Ex. 34, PCRA Hearing N.T., at 55.)  Crawford's habeas attorney became aware of the briefcase through Crawford's mother, who reported receiving an anonymous phone call.  The attorney immediately contacted the D.A. assigned to the case, and shortly thereafter sent an investigator to review and make copies of the file, at which time the lab notes were discovered.  On the basis of newly discovered evidence, Plaintiff withdrew his pending federal habeas petition and filed for post-conviction relief in the Commonwealth Court.  (Civil Action No. 00-1739, Doc. Nos. 41 & 44.)  After the Commonwealth conceded that he was entitled to a new trial, Plaintiff was released from prison, and, pursuant to an Order of the Commonwealth Court of Pennsylvania, the Dauphin County District Attorney entered a nolle prosequi.  (Doc. No. 140, Ex. A.)  The nol pros application did not state that Plaintiff was innocent of the crime; rather, the Commonwealth expressed concerns over the ability to prosecute the case due to the passage of time, death of witnesses, the potential trauma to the victim's family, and concluded that its interests were vindicated by Plaintiff's twenty-eight year incarceration such that retrial was not in the public interest.  (Id.)  Plaintiff contested the nol pros, asking the court to

---

proceedings, notes that the hair was recovered from the scene, although it appears that no testing was done on the hair at that time.  (Civil Action No. 00-1739, Doc. No. 31, Ex. D, item 16.)  Testimony at the first two trials classified the hair found in the victim's hand as "Negro," while the vial containing the hair classified the hair as "Caucasian."  (Id. at Ex. G.)  The hairs were submitted to the State Police lab in 1995, where a forensic scientist studied them and determined that they "exhibited characteristics of animal hair."  (Id. at Exs. E & F.)  The Court is not cognizant of the status of the DNA testing, or whether it is even being pursued.  It is clear from representations from counsel that the palmprint and any remaining blood or other foreign matter on it has been lost or destroyed.

amend its order so as to grant the District Attorney permission to dismiss the charges with prejudice so that Plaintiff would not be subject to future arrest and trial for this crime.  (J.A., Ex. 16.)  Crawford's motion for reconsideration was denied by Judge Kleinfelter on August 14, 2002.  (Id.)

Plaintiff subsequently brought this civil action pursuant to the Civil Rights Act, 42 U.S.C. §§ 1983, 1985, 1986, and state tort law.  This Court previously dismissed the Commonwealth as a Defendant and dismissed Plaintiff's state law claims and punitive damage request as to Defendants Harrisburg and Dauphin County.  (Doc. No. 38.)   Plaintiff has voluntarily dismissed his federal conspiracy claims and his state law claims for fraud and false imprisonment.  (Doc. No. 140 at 8.) Remaining are Plaintiff's claim brought pursuant to 42 U.S.C. § 1983 against Simpson, Roadcap, Balshy, the City of Harrisburg, and Dauphin County (Count I); Plaintiff's claim of civil conspiracy against the individual Defendants (Count V); and Plaintiff's state law claim for Intentional Infliction of Emotional Distress against the individual Defendants (Count VI).  Defendants have each filed motions for summary judgment, arguing that they are entitled to judgment in their favor on all remaining claims as a matter of law.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is material if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is genuine only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-

moving party.  Id. at 249.  The nonmoving party receives the benefit of all reasonable inferences.

Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir. 1995).

Once the moving party has shown that there is an absence of evidence to support the claims of

the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the

complaint.  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing that there is a

genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Summary judgment

should be granted where a party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden at trial."  Id. at 322.

## III.    DISCUSSION

### A.    Plaintiff's § 1983 Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law.  West v. Atkins, 487 U.S.

42, 48 (1988); Gibson v. Superintendent of N.J. Dep't of Law & Public Safety Div. of State Police,

411 F.3d 427 (3d Cir. 2005).  In his complaint, Plaintiff alleges violations of the Fourth and Fourteenth

Amendments by the individual Defendants acting under color of law and the government bodies for

which they worked.  Defendants have not challenged the "under color of law" element; rather,

Defendants argue that Plaintiff has failed to show a Constitutional violation.

Plaintiff argues that he was denied due process of law in violation of the Fourteenth Amendment

to the United States Constitution when the results of the tests on the physical evidence in the criminal

case against him were materially altered and the potentially exculpatory evidence of the alterations was

concealed.  Defendants also characterize Plaintiff's complaint as bringing a § 1983 malicious

prosecution claim.  This Court will address both claims.

### 1.   *Malicious Prosecution*

To prove malicious prosecution under § 1983, Plaintiff must show that:

(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in
plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the
defendants acted maliciously or for a purpose other than bringing the plaintiff to justice;
and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure
as a consequence of a legal proceeding.

Estate of Smith v. Marasco, 318 F.3d 497, 521-22 (3d Cir. 2003) (citing Donahue, 280 F.3d at 379-

80).[12]  The Court will address only the second of these elements as Defendants challenge only whether

Plaintiff can satisfy this particular element.  Defendants argue that Plaintiff's malicious prosecution claim

fails as a matter of law because the criminal proceedings were not terminated in Plaintiff's favor.

As noted above, the "termination" of proceedings against Plaintiff was secured during the

course of his post-conviction relief proceedings.   Plaintiff pursued relief through habeas proceedings in

federal court and properly withdrew the habeas petition in order to seek redress in state court.  During

the course of PCRA proceedings, when confronted with the full import of Roadcap's alteration of

---

[12]        Although such a standard would be beneficial to their adversary, Defendants Roadcap
and Balshy wrongly assert that in order to state a claim under § 1983 for malicious prosecution, Plaintiff
must satisfy the elements of the common law tort in Pennsylvania.  (Doc. No. 129, at 5; Doc. No. 117,
at 4.)  Thus, these Defendants miss the import of the last decade of jurisprudence in this area.  See,
e.g., Albright v. Oliver; 510 U.S. 266, 272 (1994); Torres v. McLaughlin, 163 F.3d 169 (3d
Cir.1998); Gallo v. City of Philadelphia, 161 F.3d 217 (3d Cir.1998).

critical evidence, the Commonwealth filed a petition for permission to enter a <u>nolle</u> <u>prosequi</u>.  That <u>nolle</u> <u>prosequi</u> terminated all charges against Plaintiff and directed his immediate release from prison.  Plaintiff was released from prison on July 17, 2002 and remains free today, over three years later.  It is clear that in spite of any self-serving declarations to the contrary, the Commonwealth will not bring further charges.  Thus, proceedings have terminated in Plaintiff's favor.  Relying on <u>Donahue v. Gavin</u>, Defendants argue that because the terms of the <u>nolle</u> <u>prosequi</u> do not proclaim Plaintiff's innocence, the District Attorney is technically free to prosecute Plaintiff for the offense.  As such, argue Defendants, the charges have not been officially concluded in Plaintiff's favor within the meaning of the caselaw.

Defendants' argument overlooks several important features that distinguish this case from <u>Donahue</u>.  First, by the prosecution's own statement, Plaintiff is not subject to further prosecution.  Further, unlike <u>Donahue</u>, where the prosecution was terminated because of a technical charge in the underlying statute, in the case at bar there is no dispute that the <u>nolle</u> <u>prosequi</u> was driven by prosecutorial misconduct.  The carefully crafted statement of the prosecutor in support of the <u>nolle</u> <u>prosequi</u> does not alter this essential fact.

The Court notes that the language and terms of the <u>nolle</u> <u>prosequi</u> were entirely in the prosecution's control.  Crawford did not agree to its terms and was not provided with an opportunity to be heard on the petition.  (J.A., Ex. 16.)  Plaintiff opposed the <u>nolle</u> <u>prosequi</u> as filed and moved the court for reconsideration of the order, seeking instead relief that would guarantee that he would not again be prosecuted for this crime.  (<u>Id.</u>)  Moreover, while the terms of the <u>nolle</u> <u>prosequi</u> may not indicate his innocence, they do not run afoul of any of the factors provided for in Restatement (Second)

of Torts § 660.[13]   The terms do indicate that the Commonwealth does not intend to bring further

proceedings.  Furthermore, the inaction of the Commonwealth in bringing new proceedings, even

though the Defendants threaten that they are free to do so, demonstrates that the criminal prosecution of

Plaintiff for the murder of John Mitchell has, for all intents and purposes, terminated in his favor.

It is true that the nolle prosequi entered in the Commonwealth Court did not indicate Plaintiff's

innocence and consequently the mere fact that Plaintiff's criminal conviction was nol prossed is not

sufficient to satisfy the favorable termination requirement on its own.  Donahue v.

Gavin, 280 F.3d 371, 383 (3d Cir. 2002).  However, Plaintiff cannot prove on summary judgment, and

is not required to prove, that he is innocent of the crime.[14]  The United States Court of Appeals for the

Third Circuit, when confronted with this issue, rejected the defense contention that "a judicial finding of

actual innocence is a prerequisite for a common law malicious prosecution claim," and noted that

---

[13]     The section provides:
A termination of criminal proceedings in favor of the accused other than by acquittal is
not a sufficient termination to meet the requirements of a cause of action for malicious
prosecution if:
(a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of
compromise with the accused; or
(b) the charge is withdrawn or the prosecution abandoned because of misconduct on
the part of the accused or in his behalf for the purpose of preventing proper trial; or
(c) the charge is withdrawn or the proceeding abandoned out of mercy requested or
accepted by the accused; or
(d) new proceedings for the same offense have been properly instituted and have not
been terminated in favor of the accused.
Restatement (Second) of Torts § 660 (1977).

[14]     Presumably, this would be a near impossible task, and would require looking for the
"real killer."  Even if he were to secure a confession from another individual, however,  history suggests
that Defendants would not necessarily accept this as conclusive evidence of Plaintiff's innocence.

"[a]ctual innocence is not required for a common law favorable termination, and a dismissal of charges on double jeopardy grounds is a common law favorable termination."  Smith v. Holtz, 87 F.3d 108, 113 (3d Cir. 1996) (citing Restatement (First) Torts §§ 659, 660 (1938)).  Conversely, Defendants may defend against Plaintiff's malicious prosecution claim by showing that Plaintiff is actually guilty of the crime, irrespective of the problems underlying his prosecution.  Hector v. Watt, 235 F.3d 154, 156 (3d Cir. 2000).

Therefore, Plaintiff has satisfied the element of a malicious prosecution claim contested by Defendants. Whether he is guilty or innocent of this crime is an issue of material fact that must be resolved by a jury. Accordingly, the Court will deny summary judgment on this ground.

### 2.    *Due Process of Law*

Plaintiff argues that Roadcap's alteration of her lab notes, allegedly in collusion with Simpson and Balshy, deprived him of liberty without due process of law.  Defendants argue that Plaintiff's claim fails because a chemist's lab notes were not discoverable Brady material under the law at the time of Plaintiff's prosecutions, and that the notes are not exculpatory or would not change the outcome of his criminal trial.  Plaintiff argues that post-Brady Supreme Court precedent makes it clear that the duty to disclose exculpatory evidence applies to the entire prosecutorial team, and that the failure to disclose the un-altered lab notes amounts to a Brady violation.

In Brady v. Maryland, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).  The Court subsequently held that the prosecution's duty to disclose

favorable evidence is not dependent upon a request from the accused.  United States v. Agurs, 427

U.S. 97, 107 (1976).  The prosecutorial duty to disclose includes impeachment evidence that goes only

to the credibility of a witness.  United States v. Bagley, 473 U.S. 667, 676 (1985); Napue v. Illinois,

360 U.S. 264, 269 (1959).  The duty of disclosure is not limited to evidence of which the prosecutor is

aware; rather, it includes "evidence known only to police investigators and not to the prosecutor."

Kyles v. Whitley, 514 U.S. 419, 438 (1995).  Thus, under Brady, "the individual prosecutor has a duty

to learn of any favorable evidence known to the others acting on the government's behalf in the case,

including the police."  Id. at 437.  Accordingly, the Third Circuit has recently held that police officers

may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor.  Gibson,

411 F.3d 427; see also United States v. Perdomo, 929 F.2d 967 (3d Cir. 1991) (adopting the Fifth

Circuit's approach in focusing on the entire "'prosecution team' which includes both investigative and

prosecutorial personnel") (quoting United States v. Antone, 603 F.2d 566, 569 (5th Cir. 1979)).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different."  Strickler v. Greene, 527 U.S. 263,

280-81 (1999) (citing Bagley, 473 U.S. at 676).

        Under this rubric, it is clear that the individual Defendants were obligated to tell the prosecutors

that the Benzidine test results were not as clear cut as Roadcap's report made them seem.  However,

whether the lab notes are "Brady material" is of no moment.  As the Brady Court noted, the principle of

this line of cases "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair

trial to the accused."  Brady, 373 U.S. at 87 (citing Mooney v. Holohan, 294 U.S. 103, 112 (1935)).

Accordingly, the real issue is whether Plaintiff has shown a deprivation of a constitutional right.  In the

case at bar, Plaintiff makes out a due process claim in the most classic sense.

When Roadcap screened the latent palmprint for the presence of blood, she observed under a microscope "numerous" particles in the valleys of the print which gave a positive reaction to the Benzidine reagent.  Later, she redacted any reference to the positive reaction of particles in the valleys in her lab notes.  These altered notes formed the basis for her lab report and her expert testimony at trial, the factual predicate of which was utilized in all questioning of the Commonwealth's outside experts at the three criminal trials.  Her alterations were admittedly contrary to her observations of the print (and what she stated anyone who viewed the print under the microscope would have observed, meaning Simpson and Balshy) and coincided with the prosecution's theory of the case.  While a jury might believe her testimony that this was the only case in her career of approximately 25,000 cases where she was asked to go beyond her expertise and report on how the blood particles arrived at their location – which necessitated altering her lab notes to account for her understanding of the interaction between the particles and fingerprint powder[15] – it is undisputed that Roadcap altered her notes.  Furthermore, the scientific validity of this action is dubious and the circumstances suspicious.  A lab note is a vehicle for recording a scientist's observations at the time of a test – in this case, a reaction – and the resulting report the vehicle for qualifying and explaining the test results.  Insofar as Roadcap's notes and report, by her admission, do neither, her credibility as a witness and her integrity as a scientist

---

[15]     The scenario is even more unlikely when compounded with Roadcap's acknowledged lack of expertise in fingerprints.  (See, e.g., J.A., Ex. 33 at 13 ("fingerprint evidence wasn't something chemistry received very much"); 33-34 (noting that in none of the cases in which she testified was she offered as an expert in fingerprint analysis); 60 (stating unequivocally that she had absolutely no training in fingerprint identification); 42 ("I don't recall getting fingerprints in that much").

are called into question.[16]

Defendants argue that the alterations were immaterial; defense experts now say that it does not matter whether there was blood in the ridges and valleys of the print or on the ridges alone because either way, it is a "positive print" which inculpates Crawford.  Plaintiff's expert, by contrast, states that he cannot rebut this testimony without access to the original print, calling into question an expert's ability to draw such damning conclusions without access to the actual print.  Regardless of whether modern forensic science could have solved the mystery of the particles and the palmprint, we will never know whether the particles were in fact blood, the extent of their presence in the valleys of the palmprint, and most importantly, when the print was left on the car relative to the killing.  In the course of the testing, the print was damaged and the particles (which only ever amounted to four or five pinheads' worth) expended.  In any case, it is abundantly clear that the presence of blood particles only on the ridges of the palmprint was essential to the prosecution's case in the 1970s. See, e.g., J.A., Ex. 3, N.T. at 607-08; 614-15; 640-45; 664-65; 667; 687-68; 697; 704; 711-12; 718; 764-70; see also Commonwealth v. Crawford, 364 A.2d at 662 ("No other evidence was produced to establish that appellant was inside the garage at the time of the killing.").[17]

---

[16]     Roadcap may demonstrate at trial that "correcting" lab results in this manner was an accepted practice in the scientific community or at least within the police department.  However, even Balshy admitted that he had never seen a report likewise altered, and described the usual custom of police officers of placing a line through any unwanted text and initialing the changes. (J.A., Ex. 25 at 71.)  Indeed, Roadcap did just this on another section of the notes.  The use of a magic marker to redact notes further suggests not only that it was her intention of ensuring that the original words were not able to be read, but also that she knew what she was doing was improper.  (See J.A., Ex. 33 at 58.)

[17]     The Court has exhaustively reviewed the voluminous record in this case, and it only bears noting that the record speaks for itself, irrespective of counsel's characterizations.

Defendant's argument that Crawford's criminal defense counsel considered and rejected the theory that blood was spattered on an existing print on the vehicle in Crawford's family garage is inapposite.  While it is true that defense counsel made the tactical decision to challenge whether the particles were even blood, he had limited avenues for challenging the lone piece of physical evidence, given the police officers' report that the particles fell only on the ridges of the print.  (See, e.g., J.A., Ex. 26, Costopolous Dep. at 40; 53 ("In my opinion the lack of particles in the valleys was the prosecution's smoking gun").)[18]  Defendants seem to overlook another important point in arguing that Plaintiff's own experts at trial did not observe any blood in the valleys of the palmprint:  those observations and expert testimony was likewise predicated on Roadcap's initial lab report, which was in turn based on faulty (or at least inaccurate) lab notes.  At the point that Plaintiff's experts had access to the print, the portions of the print containing the most particles, and the particles themselves, had been removed from the print for testing.  The same would be true even today, were the print available for further testing.  It bears repeating that Plaintiff was not arrested for two years after the initial identification and testing of the print.[19]

---

[18]     Moreover, Costopolous did question the witnesses as to what the effect would have been or what they would have observed had there been an existing print prior to the blood spatter – they all testified that in such a case, blood particles would have also appeared in the valleys of the print. MacDonnell made the apt analogy that blood on the ridges and not the valleys would be like throwing a bucket of red paint at a zebra and only hitting the black stripes. (J.A., Ex. 26 at 40.)

[19]     In fact, it is unclear from the record before this Court what investigative epiphany led to Crawford's arrest in 1974, as it seems that there were no substantive developments in the case at that point as compared to the identification of the first palmprint and subsequent blood screening test in 1972. Simpson continued his quest to match the eight viable prints, and apparently discovered no new evidence in the intervening two years. The only circumstance that seems to have changed was

In short, the alteration and concealment of the facts that formed the basis for the testimony regarding the only physical evidence implicating Crawford for this crime not only tend to be exculpatory under Brady, they support Plaintiff's claim that he was denied a fair trial, and thus was denied liberty without due process of law.  The due process problem is not limited to the fact that Crawford was not given the opportunity to fairly cross-examine and impeach the Commonwealth's witnesses; because the lab report formed the foundation of the expert testimony, it informed the whole of the Commonwealth's case.  As such, the original lab note, which may demonstrate to a jury the holes in the Commonwealth's case, undermines the confidence in the outcome of the criminal trial.  Strickler, 527 U.S. at 280-81.

### 3.    *Qualified Immunity*

The individual Defendants argue that even if Plaintiff makes out a constitutional claim, they are protected by the doctrine of qualified immunity because reasonable officers in their position would not have known that their conduct violated Plaintiff's civil rights.  The Court finds no merit in this argument.

The doctrine of qualified immunity protects police officers performing discretionary functions, such as arrests.  See Wilson v. Layne, 526 U.S. 603 (1999).  Qualified immunity generally shields government officials from liability for civil damages, so long as the officials' "conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In determining whether qualified immunity applies, the Court considers:  (1) whether the plaintiff has alleged the deprivation of an actual constitutional right, and if so, (2) whether the right was clearly

---

Crawford's arrest and adjudication as a juvenile delinquent for burglary.  (J.A., Ex. 24 at 13-14.)

established at the time of the alleged violation.  <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001).  As

discussed above, Plaintiff has set forth an actionable claim for deprivation of his constitutional rights.

Therefore, the Court must consider only whether that right was clearly established at the time of the

incident.  <u>Saucier</u>, 533 U.S. at 200.

     A right is clearly established if "its outlines are sufficiently clear that a reasonable officer

would understand that his actions violate the right."  <u>Sterling v. Borough of Minersville</u>, 232 F.3d

190, 193 (3d Cir. 2000).  The individual Defendants argue that because it was not clear at the time

of Plaintiff's prosecutions that police were obligated under <u>Brady</u> to disclose favorable evidence to

the accused, they are entitled to qualified immunity.  If this was the extent of the violation claimed

by Plaintiff, Defendants argument might have some appeal.  <u>See</u> <u>Gibson</u>, 411 F.3d 427 (finding

that police were entitled to qualified immunity for not disclosing the extent of their racial profiling

because the right as applied to police conduct was not clearly established).  However, the right to

be free from falsifying documents, fabricating evidence, giving misleading or perjured testimony, and

malicious prosecution was clearly established.

     It strains credibility to think that police officers could participate in the conduct alleged here

and not understand that their actions violate the accused's rights.  <u>Sterling</u>, 232 F.3d at 193.  It is

up to Plaintiff to prove by a preponderance of the evidence at trial that the individuals did in fact

conspire to alter the evidence in order to convict him and are responsible for his imprisonment.  At

summary judgment, taking the facts in the light most favorable to Plaintiff, the individual

Defendants have failed to meet their burden in demonstrating immunity for the violations claimed.

     Simpson raises the additional argument that his personal involvement in the alleged constitutional

violation has not been specified.   See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)

(requiring personal involvement by each individual defendant for § 1983 liability).  Simpson argues that

he is not implicated simply because he was present during the testing of the print and the creation of the

original unrevised lab notes and he was in possession of a copy of the lab notes upon his death.

However, from these undisputed facts, it can reasonably be inferred that Simpson did know that the

final lab report and the testimony offered at trial were substantively different from the actual test results,

which he acknowledges familiarity with, and therefore that he was aware of and condoned the

alteration, and perhaps even collaborated in it.  Accordingly, a jury might reasonably find that Simpson

violated Plaintiff's rights by conspiring with Roadcap to change the notes to comport with the result that

the prosecution needed to accuse Crawford of the murder.  Once again, one cannot know what

Simpson actually saw under the microscope or whether he testified truthfully.  The Court notes that

despite being told by ATF that it was impossible to date the print, Simpson went to great lengths at trial

to attempt date the print with expert testimony that relied almost exclusively on Roadcap's report that

the blood was present only along the ridges of the print.[20]  Each Defendant testified that the blood was

the medium of transfer and that its presence on Crawford's print placed Crawford in the garage within

a short time of the murder.  Therefore, the Court finds that it must be reserved for a fact finder to weigh

circumstantial evidence such as this to determine whether the individual Defendants violated Plaintiff's

constitutional right to due process of law.

---

[20]      Plaintiff's first murder conviction was overturned by the Pennsylvania Supreme Court
because Simpson went beyond his expertise in fingerprint identification to attempt to show what was
"scientifically impossible" (dating the print and the foreign matter on it to the time of the crime) by what
the Court called "pure conjecture."  Crawford, 364 A.2d at 663-64.

### 4.    *Liability of Municipalities*

In Monell v. Department of Social Services of New York, the Supreme Court concluded

that Congress intended § 1983 to apply to municipalities and other local government units, but that

a municipality cannot be liable for the constitutional torts of its employees based on a respondeat

superior theory.  436 U.S. 658, 690-91 (1978).  The Third Circuit recently summed up subsequent

Monell jurisprudence in this way:

> [A] municipality may only be liable for the torts of its employees in one of three ways:
> First, the municipality will be liable if its employee acted pursuant to a formal
> government policy or a standard operating procedure long accepted within the
> government entity; second, liability will attach when the individual has policy making
> authority rendering his or her behavior an act of official government policy; third, the
> municipality will be liable if an official with authority has ratified the unconstitutional
> actions of a subordinate, rendering such behavior official for liability purposes.

McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005) (citations omitted).   Municipalities are thus

liable under Monell only when fault and causation have been established.  Accordingly, the Supreme

Court has held that a "plaintiff must also demonstrate that, through its deliberate conduct, the

municipality was the 'moving force' behind the injury alleged."  Bd. of County Comm'rs of Bryan

County, Okla. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original) (quoting Monell, 436 U.S.,

at 694).

Plaintiff urges this Court to impose Monell liability on both the City of Harrisburg and the

County of Dauphin based on an alleged culture of corruption that he claims once existed within

both municipalities.  Plaintiff argues that the municipalities are liable for Simpson's conduct

because his actions were consistent with a long accepted corrupt mode of operations in both the

City and County.  Liability of each of these municipalities hinge on the conduct of Defendant

Simpson as only Simpson has any connection with the City and County.  Simpson retired from employment with the City of Harrisburg in May 1974 and went to work for the Dauphin County Attorney's Office as a detective.  Plaintiff alleges that Simpson hid exculpating evidence – the original lab note – in his briefcase, destroyed the palm print prior to trial, and offered false testimony against Plaintiff during each of the separate trials.  Simpson's change in employment occurred after the alteration of Roadcap's lab notes, but prior to Simpson's testimony at the initial trial and the September 6, 1974 analysis of the palmprint that destroyed the print.

Plaintiff points to no formal policy or standard operating procedure within the City of Harrisburg as the basis for the alleged misconduct of Simpson.  Plaintiff's complaint contains sweeping allegations that the City and County lacked sufficient safeguards to prevent the concealment of exculpatory evidence, fabrication of evidence, and false testimony; failed to train their employees to prevent such conduct; failed to properly supervise the employees, which created an environment where such misconduct was tolerated and encouraged; and failed to take action when confronted with a pattern of misconduct, which the governmental entities condoned and encouraged.  (Doc. No. 1 at ¶¶ 67-70.)  If supported by evidence, such allegations would warrant a finding of <u>Monell</u> liability on the part of the City and the County.  However, Plaintiff fails to put forward any evidence to support these alleged safeguards deficiencies or training failures.  Plaintiff's brief cites to no evidence uncovered during lengthy discovery proceedings to support these claims or to refute expert testimony offered by the City of Harrisburg that the City was in fact a leader and innovator in police training during the relevant time period.  Rather, Plaintiff levies general allegations of a corrupt atmosphere in the Harrisburg Police Department and Dauphin County District Attorney's office.  (Doc. No 140 at 34-

23

39.)  Plaintiff boldly alleges that Simpson's conduct was "part of a persistent and troubling pattern of manipulating and falsifying evidence that exists and is condoned within the law enforcement units of the Commonwealth, the City of Harrisburg and Dauphin County."  (Doc. No. 1, Ex. A at ¶ 87.)

The only support Plaintiff offers for this blanket indictment is the deposition testimony of former District Attorney LeRoy Zimmerman that three different police officials were prosecuted for corruption during the 1970s.[21]  Plaintiff also notes four instances of misconduct during unrelated criminal cases beginning in 1989.  Plaintiff contends that because these bad acts occurred, the municipalities should be held liable for any and all acts of misconduct committed by other employees in unrelated matters, including those that form the basis of his own prosecution.

Turning first to the City of Harrisburg, three prosecutions over nearly two decades does not support a finding of a culture of corruption within the City's police department or a finding that Simpson acted in conformity with that culture.  Plaintiff has not alleged or shown that these three cases were contemporaneous with or that they bear any relation to the events now at issue.  For example, it is not established that investigations of Harrisburg officials involved police mishandling of evidence or providing false testimony at trial, or that such was accepted practice in the Harrisburg Police Department.  There is nothing in the record to suggest that these cases in any way influenced the actions

---

[21]      Specifically, Mr. Zimmerman testified that former Harrisburg Police Chief C. Preston Price was prosecuted for "a form of corruption involving payment for fixing of traffic tickets."  (Doc. No. 140, Ex. G.)  Additionally, Mr. Zimmerman testified that Norman Bonneville, an assistant chief of police under Bruno Favasuli, was prosecuted for taking pay-offs from gamblers within the city of Harrisburg.  (Id.)  Although Plaintiff alleges that former chief of police, Bruno Favasuli, was also prosecuted, nothing in Mr. Zimmerman's deposition provides any details regarding the nature of this prosecution, nor the criminal activity involved.  Notably, the excerpt from Mr. Zimmerman's deposition contains no indication of when any of these prosecutions occurred.

of Simpson or others, or that Simpson was even aware of them.  The mere fact that City officials were

indicted for corruption does in an of itself make the City liable for any and all bad acts committed by

other City employees.  To find municipal liability on such a showing would undermine the principles of

Monell and impose respondeat superior liability on the City.

Although Plaintiff attempts to bolster his Monell claim by pointing to instances of police officer

misconduct related to the presentation of evidence, each such instance occurred more than eleven years

after the alleged misconduct in the instant case.  These isolated instances are insufficient to prove

Monell liability in this case.  Based upon the record before this Court, no reasonable jury could find that

Simpson acted pursuant to a culture of corruption existing within Harrisburg's police department.  As

this is the only basis for Plaintiff's claim of Monell liability against the City of Harrisburg, the City's

motion for summary judgment on Plaintiff's § 1983 claim will be granted and this claim against the City

of Harrisburg will be dismissed.

Similarly, Plaintiff has failed to establish that Dauphin County may be liable based on a "culture

of corruption" municipal liability theory.  However, Plaintiff has also alleged that Monell liability attaches

because County officials ratified the alleged outrageous actions of Simpson during Plaintiff's three trials

by repeatedly prosecuting Plaintiff, even in the face of documented irregularities.  Such a finding would

be sufficient to establish municipal liability under Monell.  See McGreevy, 413 F.3d at 367.  The

undisputed facts show that Crawford's first conviction was overturned by the Pennsylvania Supreme

Court because Simpson testified beyond his expertise, and contrary to the advice he received from

ATF regarding the dating of the print.  Commonwealth v. Crawford, 468 Pa. 565, 573 (Pa. 1976)

("The problem in this case is that the testimony was also beyond the range of the training, knowledge,

intelligence, and experience of [Simpson].  Officer Simpson admitted that his expertise was limited to

the field of lifting and identifying prints, and also admitted that [his opinion at trial] was beyond the realm

of that expertise").

Moreover, the evidence demonstrates that following Crawford's second trial, Judge Dowling

expressly found that the prosecution had disregarded evidence that another local resident with a history

of violence and racist outbursts had admitted to Mitchell's murder on multiple occasions.

Subsequently, evidence was disclosed that investigators either disregarded or failed to adequately

investigate or explain evidence of possible Caucasian hairs taken from the crime scene.  These

examples,[22] together with the entirety of suspicious circumstances surrounding Crawford's investigation

and prosecution throughout the 1970s were hardly discrete or private events, but were arguably known

to municipal officials.  Indeed, certain anomalies were made public after each of Crawford's first two

trials, both of which were overturned due to the conduct of law enforcement officials.  The Court finds

that Plaintiff has made a minimal showing from which a reasonable jury might conclude that Dauphin

County ratified the unconstitutional conduct of which Simpson is accused.  Accordingly, the Dauphin

County's motion for summary judgment on Plaintiff's § 1983 claim will be denied.

### B.    Plaintiff's State Law Tort Claims

In addition to his civil rights claims discussed above, Plaintiff maintains two state law tort

claims against the individual Defendants.  Simpson argues that he is entitled to absolute witness

---

[22]    One other example worth noting, which Plaintiff may explore at trial, is Crawford's claim that he was subjected to a polygraph examination in the early 1970s before his arrest, which he either passed or the results were inconclusive.

immunity;[23] Balshy and Roadcap argue that they are entitled to sovereign immunity for these claims.  The individual Defendants further argue that Plaintiff has failed to make a sufficient showing on the substantive elements of the claims.

### 1.        Sovereign Immunity

The Commonwealth and "its officials and employees acting within the scope of their duties" enjoy sovereign immunity from all suits except in those cases where the General Assembly of Pennsylvania has specifically waived the immunity.  1 Pa. C.S. § 2310.  Immunity has been waived in nine areas, none of which is applicable here.  42 Pa. C.S. § 8522; see also Doc. No. 38, Mem. at 8-9 (rejecting Plaintiff's argument that personal property exception to sovereign immunity applied to the Commonwealth).  Because Balshy and Roadcap were undisputedly employees of the Commonwealth, if they were within the scope of their employment when they performed the acts alleged, sovereign immunity may be available to them.

Defendants argue that because Plaintiff alleges in his complaint that the individuals were "acting under color of state law," he is precluded from arguing that they acted outside of the scope of their employment in order to defeat immunity.  Plaintiff does make this allegation in his conspiracy charge (Doc. No. 1, Ex. A at ¶ 119), however, the language "under color of law" is an inquiry of federal civil rights law, whereas the issue of scope of employment for the common law torts is evaluated under Pennsylvania law.  The Pennsylvania Superior Court has adopted the general standard of the Restatement (Second) of Agency § 228 for determining whether an employee's

---

[23]        Although Simpson did not raise this argument on motion to dismiss, this Court's holding with respect to testimonial immunity applies with equal force to the claims against Simpson.  (See Doc. No. 38 at 10-15 (refusing to extend immunity to conduct of individuals other than testifying falsely).)

conduct is within the scope of employment.  See, e.g., Costa v. Roxborough Mem'l Hosp., 708 A.2d

490, 493 (Pa. Super. Ct. 1998).  Accordingly, conduct is within the scope of employment if:  (1) it is of

a kind that the employee is employed to perform; (2) it occurs substantially within the authorized time

and space limits; and (3) at least part of its purpose is to serve the employer.  Restatement (Second) of

Agency § 228 (1958).

Balshy claims that whether he was acting within the scope of his employment is settled

because Plaintiff has plead that Balshy "acted as an agent of the Commonwealth of Pennsylvania."

(Doc. No. 1, Ex. A. at  ¶ 6.)  Although Balshy asserts that "[b]y definition a person cannot be an

agent if he/she acts outside the scope of employment," he offers no legal support for this

proposition.  (Doc. No. 144 at 4-5.)  While the Court agrees that it does appear from the record

that Balshy and Roadcap were acting within the scope of their employment as opposed to some

personal motive, this factual dispute must be resolved by a jury.  Iandiorio v. Kriss & Senko

Enterprises, Inc., 517 A.2d 530, 533 (Pa. 1986); see also Costa, 708 A.2d at 493 ("The

determination of whether a person was acting within the scope of his employment is typically a question

for the jury.").  Accordingly, the Court will not grant summary judgment for Balshy and Roadcap on

this basis.

### 2.    *Conspiracy*

To prove a claim for civil conspiracy in Pennsylvania, "the following elements are required:  (1)

a combination of two or more persons acting with a common purpose to do an unlawful act or to do a

lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the

common purpose; and (3) actual legal damage."  General Refractories Co. v. Fireman's Fund Ins. Co.,

337 F.3d 297, 313 (3d Cir. 2003) (quoting <u>Strickland v. Univ. of Scranton</u>, 700 A.2d 979, 987-88

(Pa. Super. Ct. 1997)).  As discussed above, taking the facts in a light most favorable to Plaintiff, a jury

could reasonably find that Plaintiff has demonstrated the elements for a civil conspiracy among

Roadcap, Balshy, and Simpson.  Therefore, summary judgment will be denied on this ground.

### 3.    *Intentional Infliction of Emotional Distress*

Defendants Roadcap and Balshy challenge the sufficiency of Plaintiff's intentional infliction of

emotional distress ("IIED") claim.  IIED is a state law tort, "the gravamen [of which] . . . is outrageous

conduct on the part of the tortfeasor."  <u>Clark v. Township of Falls</u>, 890 F.2d 611, 623 (3d Cir. 1989)

(quoting <u>Kazatsky v. King David Mem'l Park, Inc.</u>, 527 A.2d 988, 991 (Pa. 1987)).  "The tort of

intentional infliction of emotional distress requires a showing that the defendants acted in a manner 'so

outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and

to be regarded as atrocious and utterly intolerable in a civilized society.'"  <u>McGreevy</u>, 413 F.3d at 367

(quoting Restatement (Second) of Torts § 46, cmt).  Accordingly, the Pennsylvania Superior Court has

described the case in which liability may arise as "one in which the recitation of the facts to an average

member of the community would arouse his resentment against the actor, and lead him to exclaim,

'outrageous.'"  <u>Strickland</u>, 700 A.2d  at 987 (citations omitted).

This is one of those rare cases where if the facts are as Plaintiff claims, the conduct by the

individual Defendants could reasonably be considered outrageous.  As discussed above, a

reasonable jury could find that Defendants materially altered the laboratory test report so that

critical evidence would support the Commonwealth's case against Plaintiff.  The conduct alleged

strikes at the very heart of our system of justice and threatens to undermine civil rights that every

citizen views as inviolate.  By any measure such conduct would be outrageous.

**IV.**     **CONCLUSION**

Plaintiff's civil rights claims for deprivation of his Fourth and Fourteenth Amendment rights will proceed to trial against the individual Defendants and Dauphin County.  Furthermore, Plaintiff's conspiracy and IIED claims against the individual Defendants will also proceed to trial. An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN D. CRAWFORD,** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | **CIVIL ACTION NO. 1:CV-03-693** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, COUNTY OF** | : | |
| **DAUPHIN, CITY OF HARRISBURG,** | : | |
| **JANICE ROADCAP,** | : | |
| **JOHN C. BALSHY, and WALTON** | : | |
| **DEWEY SIMPSON, JR.,** | : | |
| **ADMINISTRATOR OF THE ESTATE** | : | |
| **OF WALTON D. SIMPSON,** | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, this 6th day of October 2005, for the reasons discussed in the within

memorandum, **IT IS HEREBY ORDERED THAT**:

1.  The motion for summary judgment filed by Defendant County of Dauphin (Doc. No.

    112) is **DENIED**.

2.  The motion for summary judgment filed by Defendant John C. Balshy (Doc. No. 116)

    is **DENIED.**

3.  The motion for summary judgment filed by Defendant Estate of Walton D. Simpson,

    adopted by Walton Dewey Simpson, Jr., Administrator of the Estate of Walton D.

    Simpson (Doc. No. 118) is **DENIED**.

4.      The motion for summary judgment filed by Defendant City of Harrisburg (Doc. No.

121) is **GRANTED**.

5.      The motion for summary judgment filed by Defendant Janice Roadcap (Doc. No. 128)

is **DENIED**.

**IT IS FURTHER ORDERED THAT** the stay issued in this case is **LIFTED**.  The Clerk of

Court is directed to refrain from entering judgment until the disposition of the proceedings.  A telephone

conference shall be held on October 27, 2005, at 10:00 a.m.   Plaintiff's counsel shall initiate this

conference call.   The telephone number of the Court is 717-221-3990.




   S/ Yvette Kane
Yvette Kane
United State District Judge